

**SO ORDERED.**

**SIGNED this 27 day of December, 2011.**

**James D. Walker, Jr.**
**United States Bankruptcy Judge**


UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | CASE NO. 10-50418-JDW |
| ROSEWOOD AT PROVIDENCE, LLC, | ) | |
| | ) | |
| DEBTOR. | ) | |


BEFORE

JAMES D. WALKER, JR.

UNITED STATES BANKRUPTCY JUDGE


<u>COUNSEL</u>

For Debtor    Ward Stone
              Matthew S. Cathey
              577 Mulberry Street, Suite 800
              Macon, Georgia 31201

For BB&T      David B. Kurzweil
              Lee B. Hart
              3290 Northside Parkway, Suite 400
              Atlanta, Georgia 30327

## MEMORANDUM OPINION

This matter comes before the Court on confirmation of Debtor's second amended plan of reorganization. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(L). After considering the pleadings, the evidence, and the applicable authorities, the Court enters the following findings of fact and conclusions of law in conformance with Federal Rule of Bankruptcy Procedure 7052.

### Findings of Fact

#### Background

Debtor, Rosewood at Providence, operates a single-asset real estate development consisting of medium-rise luxury condominiums in Charlotte, North Carolina. On February 11, 2010, Debtor filed a voluntary Chapter 11 petition. Debtor continues to operate its business and manage its property as a debtor-in-possession. On March 14, 2011, Debtor filed its second amended plan of reorganization and disclosure statement. The Court set a deadline of April 18, 2011, for casting ballots and filing objections to the plan.

Star Electric Company, Batson-Cook Company (Debtor's general contractor), and Rosewood at Providence Homeowner's Association, Inc. ("HOA") filed objections to confirmation based on unresolved water intrusion issues affecting the condominium units and voted to reject the plan. Branch Banking & Trust Company ("BB&T") filed an objection alleging multiple failures to comply with the confirmation requirements and other provisions of the Bankruptcy Code. BB&T also voted to reject the plan. The Court held a hearing on the plan and disclosure statement on April 20, 2011, during which Debtor introduced evidence of the plan's

2

compliance with the requirements for confirmation.

<u>BB&T and the Multi-Lender Agreement</u>

On April 14, 2006, Debtor entered into a Construction Loan Agreement (the "Loan Agreement") with multiple lenders to finance the development of condominium units that are owned by Debtor and that serve as collateral for the loans.[1] The Loan Agreement provides that Debtor will "borrow from each Lender" and that each lender will "make advances of its Pro Rata Share of the Loan proceeds." (Loan Agreement § 2.1(a), docket no. 561, exhibit A.) On the petition date, three lenders were parties to the Loan Agreement: (1) MV Rosewood as successor to Regions Bank, N.A. and PNC Bank, N.A.; (2) First Tennessee Bank; and (3) BB&T as successor to Colonial Bank, N.A. (the "secured lenders"). In connection with the Loan Agreement, Debtor executed a promissory note in favor of Colonial Bank, which is now held by BB&T. The note requires Debtor to pay Colonial Bank "under that certain Construction Loan Agreement ... as agent for the benefit of the Lenders[.]" (Promissory Note, docket no. 561, exhibit E; First Amended and Restated Promissory Note, docket no. 561, exhibit F.) The obligations governed by the Loan Agreement are divided in approximate proportion as follows: MV Rosewood holds 76%, First Tennessee holds 13%, and BB&T holds 11%.[2]

The Loan Agreement provides for the appointment and authorization of an administrative agent. Debtor and BB&T agree that the administrative agent is MV Rosewood (as successor of

---

[1] Also on April 14, 2006, Jerry L. Stephens, Sheryl B. Stephens, and WCDM Development, L.P. executed agreements guaranteeing the loan.

[2] Debtor contends BB&T has an interest in 11% of the debt, and BB&T contends it has an interest in 13.5% of the debt. The difference in these figures is not material for purposes of this opinion.

3

Regions Bank). Section 7.1 of the Agreement sets forth the scope of the agent's authority in

relevant part as follows:

> (a) Each lender hereby irrevocably (subject to Section 7.9[3]) appoints, designates and authorizes Administrative Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary contained elsewhere herein or in any other Loan Document, <u>Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein</u>[.]
>
> ...
>
> (c) In case of the pendency of any receivership, insolvency, liquidation, bankruptcy reorganization, arrangement, adjustment, composition or other judicial proceeding relative to Borrower or Guarantor, no individual Lender or group of Lenders shall have the right, and the Administrative Agent ... shall be exclusively entitled and empowered on behalf of itself, and the Lenders, by intervention in such proceeding or otherwise:
>
> > (i) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loan and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the lenders and the Administrative Agent ... allowed in such judicial proceeding; and
> >
> > (ii) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same[.]
>
> ...
>
> Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of the Lenders <u>except as approved by the Required Lenders</u> or to authorize the Administrative Agent to vote in respect of the claims of the Lenders <u>except as approved by the Required Lenders</u> in any such proceeding.

---

[3] Section 7.9 provides for a successor administrative agent upon the resignation or removal of the original administrative agent.

4

Loan Agreement § 7.1 (emphasis added). The Loan Agreement defines "Required Lenders" as "Lenders having more than 50% of the Aggregate Commitments[.]" Loan Agreement § 1.1. Because MV Rosewood holds approximately 76% of the commitments under the Loan Agreement, it is the sole required lender.

Debtor's second amended plan of reorganization classifies the secured lenders in Class 1B. No other creditors are included in the class. Section 3.2.2 of the plan makes the following provisions for Class 1B: Debtor's remaining condominium units, along with certain other claims and interests of Debtor will be transferred to Newco, a newly created limited liability company. Newco will be owned by the secured lenders on the effective date of the plan in pro-rata shares equal to each lender's interest in the Loan Agreement. The secured lenders will receive the LLC membership shares in exchange for full satisfaction of their claims[4] and the assumption of exit financing. MV Rosewood will provide the exit financing to Debtor in the amount of $2.25 million, which will be secured by a first priority lien in the remaining units. In addition, § 10.7 of the plan provides for the release of all liens on the condominium units other than the Class 1A mechanics' liens and the exit financing lien.

<u>The Plan</u>

Debtor's plan is a liquidating plan. It provides for seven classes of claims as follows:

• Class 1A: Allowed secured claims of materialmen whose liens are senior to the members of Class 1B.

---

[4] Pursuant to the terms of the Loan Agreement, the administrative agent filed one proof of claim in the amount of $23,892,731.21 for the total obligations outstanding under the Loan Agreement. BB&T did not file a separate proof of claim. Any references to BB&T's claim in this memorandum opinion are to its interest in the master claim. The Court makes no determination about whether BB&T's interest in the master claim may be deemed a separate and independent secured claim, because such a ruling is unnecessary to resolve the issues in this case.

- Class 1B: Allowed secured claims of the secured lenders under the Loan Agreement.

- Class 1C: Allowed secured claims of materialmen whose liens are junior to the members of Class 1B.

- Class 1D: The HOA's claims for unpaid dues.

- Class 1E: The claims of Batson-Cook.

- Class 2: Priority claims.

- Class 3: Allowed claims of convenience creditors whose claims total $5,000 or less or who have voluntarily reduced their claims to $5,000.

- Class 4: General unsecured creditors.

- Class 5: Unliquidated tort claims of individual condominium owners and of the HOA for the negligent construction of the units, resulting in water intrusion problems.

- Class 6: Claims of Jerry Stephens, the principal of Debtor.

- Class 7: Equity interests of Debtor.

The plan identifies all classes as impaired. Classes 1A, 1B, 1C, 1D, 1E, 3, 4, and 5 have accepted the plan. Classes 1A, 1E, and 5 initially voted to reject the plan but have provided written acceptances based on a plan modification filed on October 19, 2011.[5] The modification did not affect the treatment of Class 1B claims. With respect to Class 1B, MV Rosewood and Bank of Tennessee, who account for 89% of the claim amount and 2/3 of the members of the class, cast votes accepting the plan, and BB&T cast a vote rejecting the plan. No priority claims have been filed in the case; thus, no votes were cast for Class 2. Although Class 6 is a voting class, its sole claim holder did not submit a ballot and, therefore, has not accepted the plan. Class 7 is a nonvoting class because its interests are being extinguished, and it is deemed to reject the plan.

As discussed above, the plan provides for the transfer of the remaining condominium

---

[5] On October 19, 2011, Debtor filed a motion to modify a plan before confirmation pursuant to Fed. R. Bankr. P. 3019(a). The Court granted the motion.

units to Newco, owned by the Class 1B secured lenders, in full satisfaction of the Class 1B

claims. Exit financing will be used to fund payments to several classes of junior creditors. In

addition, the plan provides a mechanism for satisfying Debtor's delinquent dues obligations to

the HOA, which will serve to remove barriers to retail financing for buyers of the units,[6] and it

provides a means of correcting the water intrusion issues.

During the April 20, 2011, confirmation hearing, Debtor introduced the testimony of

multiple witnesses:  Jerry Stephens, the principal of Debtor, testified regarding the plan's general

compliance with the confirmation criteria. T.B. Harris, Jr., an appraiser, provided expert

testimony regarding the present value of the remaining units owned by Debtor in a quick sale to

an unrelated party. Doug Stephan, a representative of MV Rosewood and Newco, testified about

the intent of the parties acquiring Debtor's remaining units under the plan to continue to develop

those units for sale at retail and to maximize their value.

Mr. Stephens testified that, to the best of his knowledge, the plan complies with all

applicable provisions of the Bankruptcy Code, and the plan proponent has complied with all

applicable provisions of the Bankruptcy Code. Mr. Stephens also testified that no government

regulatory commission governs rates charged by Debtor. Mr. Stephens further testified he

believes the plan is fair and equitable to creditors because it provides for finishing the units, and

solving the water intrusion problem, which will increase the retail value of the units and provide

creditors with a greater distribution than they would receive in a Chapter 7 liquidation.

Mr. Harris testified that the value of the 49 units that were unsold as of March 11, 2011,

---

[6] Buyers of new units will not be eligible for government-backed financing as long as 15% or more of the units in the development are delinquent on HOA dues. Debtor currently retains more than 15% of the units and is past due on the HOA dues for those units.

is $15.5 million from a bulk sale on the effective date of the plan to a third party. Mr. Harris

arrived at this figure by applying a 20% discount rate to the expected future net cash flows from

the property over an absorption period of 36 months. The 20% discount rate includes the cost of

funds plus a risk factor representing an acceptable return to an investor in an arm's length

transaction.[7] Although Mr. Harris did not conduct a Chapter 7 liquidation analysis, he testified

that in his opinion, the liquidation value of the remaining units would be significantly below

$15.5 million.

Doug Stephan testified that the parties acquiring the remaining units intend to develop

and market the units for sale at retail and that they have a plan for doing so. He also testified that

the Chapter 11 plan will provide a greater return on the units than a liquidation sale because it

provides a means for resolving the water intrusion issues and it eliminates obstacles to

homeowner financing posed by the existence of the bankruptcy case, underfunded HOA

accounts, and past due HOA membership fees.

At the conclusion of the hearing, Debtor requested a continuance to attempt to resolve

objections to the plan. The Court granted the continuance and reconvened the hearing on October

19, 2011. At that time, Debtor announced a resolution with Star Electric, Batson-Cook, and the

HOA, each of which withdrew its objection and changed its vote to accept the plan. The only

remaining objection outstanding is that of BB&T. The Court heard oral arguments on BB&T's

objection and solicited briefs from the parties. Having considered all the relevant facts and legal

---

[7] Mr. Harris also calculated a present value for the remaining units of $20.1 million using
a discount rate of 5%. Debtor apparently requested this calculation because the maximum interest
the secured lenders may receive under the Loan Agreement is 5%. However, the relationship
between a 5% discount rate on future cash flows of the collateral and a 5% yield on loan
principal is not clear, which renders the $20.1 million figure of dubious relevance.

arguments, the Court concludes that BB&T has accepted the plan through the vote of its agent

and that the plan meets all the requirements for confirmation. Therefore, the plan will be

confirmed.

## Conclusions of Law

### BB&T Authorized MV Rosewood to Vote on and to Accept the Plan on Its Behalf

As a threshold matter, the Court must determine whether BB&T is entitled to vote on the

plan. BB&T contends that because it holds a secured claim against Debtor, it is entitled to vote

on and object to the plan. The parties agree that the Loan Agreement establishes a syndication

loan, under which each lender, including BB&T, has a contractual relationship with Debtor.[8]

However, BB&T also has a contractual relationship with the other secured lenders  through

which it voluntarily bargained away certain rights in the event of Debtor's bankruptcy.

BB&T concedes that the administrative agent has authority under § 7.1(c) to vote on and

accept the plan on behalf of BB&T when so approved by the required lender. However, BB&T

contends the agent's authority to do so is qualified by § 8.9 of the Loan Agreement, which

requires the unanimous approval of the secured lenders for certain actions.

Section 8.9 of the Loan Agreement is titled "Amendments; Survival." It provides in

---

[8] This Court has previously observed that multi-lender transactions often take one of two forms: a syndication loan or a participation loan. "[W]ith syndication loans, multiple lenders loan money to the borrower, and each lender has a contractual arrangement with the borrower. By contractual agreement among the lenders, one lender is designated agent for all the lenders. ... In a participation agreement, one lender (the lead lender) provides the loan, and only that lender has a contractual relationship with the borrower[.]" Tidwell v. Legrand (In re Amron Tech., Inc.), Bankr. Case No. 06-50508, Adv. No. 06-5081, 2007 WL 917236 (Bankr. M.D. Ga. March 22, 2007) (Walker, J.) (citing W. Crews Lott et al., Multiple Lender Transactions: Current Issues, 112 Banking L.J. 846, 846-47 (1995)). Based on these definitions, the Loan Agreement in this case is a syndication loan.

9

relevant part as follows:

> Administrative Agent and Lenders shall be entitled to amend any of the terms, conditions or agreements set forth in <u>Article VII</u> or as to any other matter in the Loan Documents respecting payments to Administrative Agent or Lenders or the required number of the Lenders to approve or disapprove any matter or to take or refrain from taking any action, without the consent of Borrower. ... Subject to the foregoing, Administrative Agent may amend or waive any provision of this Agreement or any other Loan Document, or consent to any departure by any party to the Loan Documents therefrom which amendment, waiver or consent is intended to be within Administrative Agent's discretion or determination, or otherwise in Administrative Agent's reasonable determination shall not have a Material Adverse Effect; <u>provided</u> however, otherwise no such amendment, waiver or consent shall be effective unless in writing, signed by the Required Lenders and Borrower or the applicable party to the Loan Documents, as the case may be, and acknowledged by Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u> further however, no such amendment, waiver or consent shall:
> ...
> (g) release the liability of Borrower or any existing Guarantor without the written consent of each Lender;
> (h) permit the sale, transfer, pledge, mortgage or assignment of any Loan collateral or any direct or indirect interest in Borrower, except as expressly permitted under the Loan Documents, without the written consent of each Lender; or
> (i) transfer or release any lien on, or after foreclosure or other acquisition of title by Administrative Agent on behalf of the Lenders transfer or sell, any Loan collateral except as permitted in Section 7.10, without the written consent of each Lender[.]

Loan Agreement § 8.9 (emphasis in original).

In short, under § 8.9 the administrative agent may amend or waive provisions of the Loan Agreement or consent to a departure from the loan documents, except that the amendment, waiver, or consent cannot release guarantors, transfer collateral, or release liens without the written consent of all lenders. BB&T argues that section 8.9 conflicts with the administrative

10

agent's right to accept Debtor's Chapter 11 plan on behalf of BB&T because the plan will result

in the transfer of collateral, release of liens, and release of guarantors without BB&T's written

consent.

Under North Carolina law, which governs the Loan Agreement, when the general and

specific terms of an agreement conflict, the specific terms prevail. <u>Development Enter. of

Raliegh v. Ortiz</u>, 356 S.E.2d 922, 924-25 (N.C. App. 1987). To the extent there is any conflict

between § 7.1(c) and § 8.9 of the Loan Agreement, § 7.1(c) is the more specific provision

because it applies in a specific set of narrowly defined circumstances–the agent's authority to act

in the event of Debtor's bankruptcy.[9]  Section 8.9, on the other hand, applies to amendments to

the Loan Agreement or loan documents. In this case, the agent has not proposed any amendment

to or waiver of any provisions of the Loan Agreement and, thus, its actions do not implicate §

8.9. On the contrary, by voting to accept the plan on behalf of the secured lenders, the agent

proposes to implement an existing provision of the Loan Agreement according to its terms. The

consequences BB&T complains of–release of liens, release of guarantors, and transfer of

collateral–are the foreseeable results of a borrower's bankruptcy and could have been expressly

excluded from the administrative agent's power under § 7.1(c), as they were excluded from the

---

[9] See <u>Development Enter. of Raleigh</u>, 356 S.E.2d at 925. At issue was construction of a
partnership agreement regarding the appropriate price for acquiring the interest of a deceased
partner from that partner's estate. Section 7 of the partnership agreement provided that defaulting
partners (which expressly included deceased partners) were entitled to receive the "net value" of
their interest. Section 19 provided that the partners could reacquire partnership interests that were
in the hands of a stranger to the partnership agreement at a price determined by majority vote of
the partners. The court held Section 7 was the more specific provision and should prevail because
it "specifically deals with the death of a partner ... [w]hile section 19 deals generally with
transferred partnership interests[.] <u>Id.</u> Similarly § 7.1(c) of the Loan Agreement specifically deals
with the bankruptcy of the borrower while § 8.9 deals generally with amendments to the Loan
Agreement.

11

agent's amendment power. However, the Court will not imply a limitation on the agent's authority to act in the borrower's bankruptcy case simply because the parties agreed to limit the agent's authority to amend the Loan Agreement.

BB&T does not dispute that MV Rosewood is both the administrative agent and the required lender under the Loan Agreement. Furthermore, BB&T does not dispute that MV Rosewood, as the required lender, has approved the administrative agent to vote on and to accept the plan on behalf of all the secured lenders. Therefore, MV Rosewood is authorized to vote on behalf of all the secured lenders, including First Tennessee Bank and BB&T. Any separate votes cast by those lenders are of no consequence and shall not be included in the tally of votes.

<u>The Plan Does not Require the Court to Act Outside Its Jurisdiction</u>

BB&T argues that the plan requires the Court to act outside the scope of its authority because, by virtue of confirming the plan, the Court will be ordering BB&T to enter into an LLC agreement where none previously existed and will be modifying BB&T's contractual rights with its agents. BB&T is mistaken. As the Court has determined, MV Rosewood is authorized to accept the plan on BB&T's behalf. Thus, BB&T, through its agent, is voluntarily taking on new contractual obligations. This was part of the bargain BB&T agreed to when it purchased Colonial's interest in the Loan Agreement. The Court's role is merely to determine whether the confirmation criteria are satisfied. While a confirmation order binds the parties to the provisions on the plan pursuant to 11 U.S.C. § 1141(a), the parties here are being bound to their own consensual agreements, not to any treatment unilaterally imposed by the Court.

<u>The Plan Meets all Requirements for Confirmation</u>

The requirements for confirmation of a Chapter 11 plan are set forth in 11 U.S.C. §

12

1129(a). The Court has an independent duty to ensure each requirement is satisfied. See In re Lett, 632 F.3d 1216, 1229 (11th Cir. 2011) (citing In re Piper Aircraft Corp., 244 F.3d 1289, 1299-1300 n.4 (11th Cir. 2001); In re Baugh, 73 B.R. 414, 416 (Bankr. E.D. Ark. 1987)). The requirements are evaluated under a preponderance of the evidence standard. In re Atlanta S. Bus. Park, Ltd., 173 B.R. 444, 447-48 (Bankr. N.D. Ga. 1994).

**Section 1129(a)(1): The plan complies with the Bankruptcy Code.** Section 1129(a)(1) requires the plan to comply "with the applicable provisions" of the Bankruptcy Code. Jerry Stephens, the principal of Debtor, testified it does. BB&T disagrees. Specifically BB&T points to violations of § 524(e) because the plan releases guarantors; § 364 because the plan provides for a priming lien on the remaining condominium units without providing adequate protection to the secured lenders; and § 1123 because the plan does not classify BB&T's unsecured deficiency claim. The Court finds no merit in any of these arguments.

*Guarantors*: At the time the Loan Agreement was executed, Jerry Stephens, Sheryl Stephens, and WCDM Development also executed guarantees of the loan. The plan provides for full satisfaction of Debtor's obligations under the Loan Agreement via membership interests in an LLC that will become the owner of the condominium units securing the loan. BB&T argues that, by providing for full satisfaction of its obligations, the plan effectively releases the guarantors from liability[10] and that such a result is barred by § 524(e).

Section 524(e) states: "Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." As the Sixth Circuit Court of Appeals noted in In re Dow Corning

---

[10] No provision of the plan expressly provides for the release of the guarantors' liability.

13

Corp., 280 F.3d 648, 657 (6th Cir. 2002), "this language explains the effect of a debtor's

discharge. It does not prohibit the release of a non-debtor." Because the plan at issue in this case

is a liquidating plan,[11] confirmation will not result in entry of a discharge. 11 U.S.C. §

1141(d)(3)(A). Furthermore, courts generally hold that a plan provision releasing guarantors does

not violate § 524(e) if the creditor consents to the release. In re Specialty Equip. Cos., Inc., 3 F.3d

1043, 1047 (7th Cir. 1993). In this case, BB&T, through its agent, consented to the plan and all its

consequences. Thus, BB&T's argument fails on three grounds. First, the plan does not by its

terms provide for the release of the guarantors' liability. Second, BB&T consented to full

satisfaction of its debt and any results that flow from that. Third, while the guarantors may be

released from liability by the extinguishment of the outstanding debt–which extinguishment is

detailed in the plan–such a release is not a function of entry of a discharge. Therefore, the Court

concludes the plan does not run afoul of § 524(e).

*Priming liens*: Section 364(d)(1) authorizes the trustee to obtain credit secured by a lien

on property that primes an existing lien if "(A) the trustee is unable to obtain such credit

otherwise; and (B) there is adequate protection of the interest of the holder of the lien on the

property of the estate on which such senior or equal lien is proposed to be granted." Under the

plan, the condominium units that currently serve as collateral under the Loan Agreement will be

transferred to Newco, BB&T will receive a membership interest in Newco in full satisfaction of

its debt, and the secured lenders' liens against the units will be released. MV Rosewood will

provide exit financing that will be secured by a new lien on the units. BB&T contends the exit

---

[11] See Second Amended Plan of Reorganization of the Debtor, § 8.1, docket no. 359
("This is a liquidating plan. The Debtor shall not receive a discharge as provided under 11 U.S.C.
§ 1141(d)(3).").

financing lien primes its lien and cannot be allowed unless BB&T receives adequate protection. BB&T is incorrect. The plan provides for the extinguishment of its liens, not for the priming of its liens. However, even if the plan were construed to prime BB&T's lien, BB&T agreed to such treatment by accepting the plan. Therefore, the plan does not violate § 364.

*Classification of deficiency claims*: Section 1123(a)(1)-(3) requires a Chapter 11 plan to "designate ... classes of claims," to specify whether or not the class is impaired, and to specify treatment for impaired claims. BB&T argues that the secured lenders have an unsecured deficiency claim under § 506(a)[12] because the amount of their claim (approximately $23 million) exceeds the value of the collateral as it existed on March 11, 2011[13] ($15.5 million). And, the plan's failure to classify and provide treatment for their unsecured claim violates § 1123.

First, the secured lenders have not asserted an unsecured claim. On the contrary, their proof of claim asserts a secured claim of $23,982,731.21 and no unsecured claim. Pursuant to Bankruptcy Rule 3001(f), "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Furthermore, under § 502(a), when a proof of claim is filed, the claim "is deemed allowed, unless a party in interest ... objects." Because no objection to the claim has been filed, the secured lenders are deemed to have an allowed secured claim in the amount set forth in their proof of claim. Thus, there is no unsecured claim to be classified.

Second, even assuming the secured lenders held an unsecured claim, the Code does not

---

[12] Section 506(a) provides for bifurcation of oversecured claims into separate secured and unsecured claims.

[13] At least seven of the units have since been sold.

15

require such claims to be classified separately. Instead, it requires similar claims to be placed in the same class. 11 U.S.C. § 1122(a). The court in In re Orfa Corp. of Philadelphia, 129 B.R. 404, 416-17 (Bankr. E.D. Penn. 1991), found that a plan may place a creditor's secured and unsecured claims in the same class when the claims arise out of the same obligation and when such classification is not the result of gerrymandering to obtain acceptance of the plan by an impaired class.  In this case, BB&T's claim arises in its entirety from BB&T's interest in the Loan Agreement. It is included in Class 1B, which contains only claims arising from the Loan Agreement. The plan identifies the class as impaired and fully explains the class's treatment. BB&T accepted such treatment through its agent. Furthermore, there is no suggestion of gerrymandering to create an accepting impaired class, because multiple impaired voting classes have accepted the plan. The facts here show no violation of § 1123.

For the foregoing reasons, the Court finds the plan complies with the applicable provisions of the Bankruptcy Code and therefore satisfies § 1129(a)(1).

*Section 1129(a)(2): The proponent of the plan complies with the Bankruptcy Code.*
Section 1129(a)(2) requires that a plan proponent "compl[y] with the applicable provisions of this title," including without limitation §§ 1125 and 1126. Mr. Stephens testified that Debtor has complied, and no party has asserted otherwise. Therefore, the Court finds that § 1129(a)(2) is satisfied.

*Section 1129(a)(3): The plan is proposed in good faith.* Section 1129(a)(3) requires the plan to be "proposed in good faith and not by any means forbidden by law."  Debtor can establish good faith by showing:

there is a reasonable likelihood that the plan will achieve a result

16

> consistent with the objectives and purposes of the Code. ... Where
> the plan is proposed with the legitimate and honest purpose to
> reorganize and has a reasonable hope of success, the good faith
> requirements of section 1129(a)(3) are satisfied. ... The focus of a
> court's inquiry is the plan itself, and courts must look to the totality
> of the circumstances surrounding the plan, ... keeping in mind the
> purpose of the Bankruptcy Code is to give debtors a reasonable
> opportunity to make a fresh start.

McCormick v. Banc One Leasing Corp. (In re McCormick), 49 F.3d 1524, 1526 (11th Cir. 1995)

(citations omitted). In this case, the totality of the circumstances indicate the plan has been

proposed in good faith. The plan is the result of extensive negotiations. It provides for payment

in full of Class 1A claims, it provides for remedying defects on assets that will be transferred to

the Class 1B claim holders, and it provides for distributions to other creditors who would have

received nothing in a liquidation. For these reasons, the plan satisfies § 1129(a)(3).

  ***Section 1129(a)(4): Payment of costs and expenses is subject to court approval.*** Section

1129(a)(4) requires that any payments "for services or for costs and expenses in or connection

with the case" be approved by the Court as reasonable. Section 9.1 of the plan provides for

retention of jurisdiction by the Court to hear and determine all applicable applications for

allowance of compensation and reimbursement of expenses. Section 3.1.1 of the plan establishes

a 60-day deadline from the service of notice of the confirmation order for filing of final

applications for professional fees. The procedures set forth in the plan satisfy the requirements of

§ 1129(a)(4).

  ***Section 1129(a)(5): Identity of management and insiders has been disclosed.*** Section

1129(a)(5) requires that: (i) the plan proponent disclose the identity and affiliations of the

proposed officers and directors of the reorganized debtor or any successor to the original debtor;

17

(ii) the appointment of such officers and directors be consistent with the interests of the creditor

and equity security holders and with public policy; and (iii) the plan proponent disclose the

identity and compensation of any insiders to be retained or employed by the reorganized debtor.

This information is disclosed in Article IV of the plan, which provides that the manager of the

debtor-in-possession will be its sole member, WCDM Development L.P., acting through its

general partner, J&S Acquisitions, Inc., acting through its president, Jerry L. Stephens, who will

not be compensated. This disclosure is sufficient to satisfy § 1129(a)(5).

*Section 1129(a)(6): No regulatory approvals are needed.* Section 1129(a)(6) requires

that any regulatory commission having jurisdiction over the rates charged by the reorganized

debtor approves any rate changes provided for in the plan. Mr. Stephens testified Debtor does not

charge any rates subject to regulatory approval. Therefore, § 1129(a)(6) is satisfied.

*Section 1129(a)(7): Best interests test.* Section 1129(a)(7) provides as follows

> With respect to each impaired class of claims or interests–
> (A) each holder of a claim or interest of such class–
> (i) has accepted the plan; or
> (ii) will receive or retain under the plan on account
> of such claim or interest property of a value, as of
> the effective date of the plan, that is not less than
> the amount that such holder would so receive or
> retain if the debtor were liquidated under chapter 7
> of this title on such date[.]

11 U.S.C. § 1129(a)(7) (emphasis added).

To satisfy the best interests test, each claim holder in an impaired class must either accept

the plan or receive not less than it would receive in Chapter 7 liquidation. BB&T contends the

test is not satisfied because the plan will not provide it with at least the present value of what it

would receive in a Chapter 7 liquidation. The plan identifies all classes as impaired. However, all

18

classes entitled to vote under the plan have accepted the plan, except Class 6. Although BB&T objects to the plan, it accepted the plan through the vote of its agent.

Even if BB&T held a separate and independent claim and had voted against the plan, the Court finds it will receive more under the plan that it would in a liquidation. Mr. Harris testified that the liquidation value of the units would be substantially less than the present value of $15.5 million. His opinion was uncontested. Under the plan, BB&T will have an interest in the remaining condominium units (via its membership in the Newco LLC), which can be sold in a finished state, free from water intrusion defects, and free from obstacles to retail financing. By contrast, in a liquidation, BB&T would merely receive a share in the proceeds from unfinished, defective units. Even taking into account the $2.25 million exit financing lien on the units, the Court is persuaded the plan offers a better value to BB&T than Chapter 7 liquidation would.

With respect to the nonaccepting impaired classes, Class 6 did not vote to accept the plan, but Class 6 has previously subordinated its claims to other creditors and will receive no more than it would receive in a Chapter 7 liquidation. Class 7, which neither receives nor retains any property under the Plan, is deemed to have rejected the plan pursuant to § 1126(g). A Chapter 7 liquidation of Debtor's estate would decrease the proceeds available for distribution to creditors, because the units would be sold subject to the water intrusion issues and without the Fannie Mae certification that benefits retail buyers. As a result, Class 7 would receive no distribution in a liquidation. Therefore, the class is not harmed by the plan, and § 1129(a)(7) is satisfied.

*Section 1129(a)(8): Class acceptance.* Under § 1129(a)(8), each class must either accept the plan or not be impaired by it. In this case all classes entitled to vote have accepted the plan, except Class 6. In addition, Class 7 is deemed to reject the plan under § 1126(g) because the

interests in the class will not receive or retain any property under the plan. While § 1129(a)(8) is

not satisfied, the plan may still be confirmed pursuant to a cramdown under § 1129(b), discussed

below.

*Section 1129(a)(9): Priority claims.* Section 1129(a)(9) sets forth the treatment that must

be afforded to priority claims, unless the claim holder agrees otherwise. Section 3.1.1 of the plan

provides that administrative claims will be paid in full on the effective date of the plan or on the

date in which such claim becomes an allowed claim. Section 3.1.2 provides the same treatment

for priority tax claims. These provisions satisfy the requirements § 1129(a)(9).

*Section 1129(a)(10): One consenting impaired class.* Under § 1129(a)(10), at least one

class of impaired claims, other than insiders, must vote to accept the plan. In this case, all

impaired classes entitled to vote, other than Class 6, have accepted the plan. Therefore, §

1129(a)(10) is satisfied.

*Section 1129(a)(11): Feasibility.* Under § 1129(a)(11), the Court may not confirm a plan

that is "likely to be followed by the liquidation, or the need for further financial reorganization ...

unless such liquidation or reorganization is proposed in the plan." Section 4.1 of the plan

provides that the plan is a liquidating plan. Furthermore, MV Rosewood has committed to

provide exit financing to pay creditors under the plan. Therefore, there will be no further need for

reorganization, and the plan meets the feasibility requirement of § 1129(a)(11).

*Section 1129(a)(12): Payment of U.S. Trustee fees.* Section 1129(a)(12) requires that all

fees payable under 28 U.S.C. § 1930 have either been paid or will be paid on the effective date of

the plan. Section 3.1.1 of the plan provides that such fees shall be paid in full on the effective

date either out of cash on hand or out of the exit financing. Therefore, § 1129(a)(12) is satisfied.

***Sections 1129(a)(13) to (a)(16): Miscellaneous inapplicable provisions.*** The remaining provisions of § 1129(a) are inapplicable to this case. Subsection (a)(13) applies to certain retiree benefits not present in this case, subsection (a)(14) applies to domestic support obligations, subsection (a)(15) applies to individual debtors, and subsection (a)(16) applies to nonprofit entities.

***Section 1129(b): Cramdown.*** Based on the foregoing, Debtor has demonstrated the plan's compliance with all subsections of § 1129(a) except (a)(8). Therefore, the plan is not eligible for consensual confirmation. Nevertheless, the plan may be confirmed if the provisions of § 1129(b), commonly known as cramdown, are satisfied. Section 1129(b)(1) provides as follows:

> [I]f all applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted the plan.

The only impaired classes that have not accepted the plan are Classes 6 and 7. Class 6 includes the unsecured insider claim of Mr. Stephens. A plan is fair and equitable with respect to a class of unsecured claims if junior claims or interests "will not receive or retain under the plan on account of such junior claim or interest any property[.]" 11 U.S.C. § 1129(b)(2)(B)(ii). In this case, the only junior claims or interests are the interests in Class 7, which will be extinguished. Thus, the cramdown requirements are satisfied as to Class 6.

Class 7 consists of the holders of equity interests, who were deemed to reject the plan under § 1126(g) on account of not receiving or retaining any interest or property under the plan.

21

Section 1129(b)(2)(C)(ii) provides that a plan is fair and equitable with respect to a class of interests if the holder of a junior interest "will not receive or retain on account of such junior interest any property." Class 7 claims will receive no distribution and the equity interests will be cancelled; no interests are junior to Class 7. Thus, no junior interests are retaining property on account of their interest, and the cramdown requirements are satisfied as to Class 7.

Because all nonaccepting impaired classes will receive fair and equal treatment under the plan, and because there is no evidence that the plan discriminates unfairly, the plan may be confirmed by cramdown.

Conclusion

The Court finds Debtor's plan satisfies the requirements § 1129(a) other than (a)(8) and satisfies § 1129(b)(1). Therefore, the Court will confirm the plan.

An Order in accordance with this Opinion will be entered on this date.

END OF DOCUMENT